# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: BEYOND MEAT, INC., PROTEIN CONTENT MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) ) ) | No. 23 C 669<br><br>MDL No. 3059<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs filed several putative class action lawsuits against Defendant Beyond Meat, Inc., alleging that Beyond Meat misleads consumers into believing that the protein content in its products is higher in terms of both quantity and quality. The Judicial Panel on Multidistrict Litigation consolidated the cases before this Court, and Plaintiffs filed a consolidated complaint. Plaintiffs bring claims for violation of various state consumer fraud acts,[1] as well as breach of express and implied warranties and the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, unjust enrichment, fraud, and negligent misrepresentation. Beyond Meat has moved to dismiss the consolidated complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court dismisses Plaintiffs' requests for injunctive relief without

---

[1] Specifically, Plaintiffs bring claims for violation of the following state consumer fraud statutes: the California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*; the Massachusetts Regulation of Business Practices for Consumer Protection Act, Mass. Gen. Laws Ch. 93A *et seq.*; the Michigan Consumer Protection Act, Mich. Comp. Law § 445.901 *et seq.*; the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.67 *et seq.*; the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*; the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.*; the New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349 *et seq.*; and the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 *et seq.* They also separately allege violations of the California Consumer Legal Remedies Act, Civil Code § 1750 *et seq.*; the California False Advertising Law, Bus. & Prof. Code § 17500 *et seq.*; the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 505/2 *et seq.*; the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H; the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.01 *et seq.*; the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101 *et seq.*; and the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

prejudice for lack of standing. The Court dismisses Plaintiffs' front-label protein content claims without prejudice as preempted. The Court dismisses Plaintiffs' common law fraud claims, as well as Zakinov's fraud-based claims based on the presence of non-natural, artificial, or synthetic materials in the Products, without prejudice for failure to comply with Rule 9(b). The Court finds that the remaining claims can proceed to discovery.

BACKGROUND[2]

## I.      Relevant FDA Regulations

Pursuant to the Food, Drug, and Cosmetics Act (the "FDCA"), as amended by the Nutrition Labeling and Education Act (the "NLEA"), the Federal Drug Administration (the "FDA") has adopted regulations governing the nutritional labeling of food. 21 U.S.C. § 341. Among other things, the FDA requires manufacturers to provide information about the level of certain nutrients, including protein, on a product's nutrition facts panel ("NFP") typically found on the side or the back of the product's packaging. 21 C.F.R. § 101.9(c). The statute and regulations also specify the claims that a manufacturer can make about a food's nutrient content outside of the NFP, known as nutrient content claims. 21 U.S.C. § 343(r)(1)(A); 21 C.F.R. § 101.13(b). The regulations about nutrient content claims incorporate some of the standards for claims made in NFPs, with compliance with the nutrient content regulations determined by using the methodology provided in the NFP regulation. 21 C.F.R. § 101.13(o). As relevant to this case, the NFP regulation provides two methods for calculating the amount of protein in a product. 21 C.F.R. § 101.9(c)(7). Section 101.9(c)(7) requires manufacturers to list protein in the NFP as the "number of grams of protein in a serving." *Id.* Manufacturers may calculate that

---

[2] The Court takes the facts in the background section from Plaintiffs' consolidated class action complaint and presumes them to be true for the purpose of resolving Beyond Meat's motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). The Court also takes judicial notice of matters of public record where appropriate. *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

amount using the nitrogen method, namely, "on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the 'Official Methods of Analysis of the AOAC International,' except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used." *Id.* Section 101.9 provides that the label can also use a "corrected amount of protein per serving" that is adjusted for protein digestibility by using the protein digestibility-corrected amino acid score ("PDCAAS").[3] *Id.* If a label includes a protein content claim, § 101.9 requires the manufacturer to display the PDCAAS-corrected protein content as a percentage of daily value ("%DV") and the protein quantity in grams in the NFP. *Id.* § 101.9(c)(7)(i). In calculating %DV, the regulations specify that 50 grams is the daily value for protein for adults. *Id.* § 101.9(c)(7)(ii).

## II. Beyond Meat

Beyond Meat, a plant-based meat substitute company, was founded in 2009. Beyond Meat describes itself as a "leader in plant-based meat" and its products as the "future of protein." Doc. 12 ¶ 34. Beyond Meat launched its initial product line in 2012. Its current products include: Sausage Plant-Based Dinner Links Hot Italian 14 oz, Beyond Sausage Plant-Based Dinner Sausage Links Brat Original 14 oz, Beyond Beef Plant-Based 16oz Patties, Beyond Beef Plant-Based Ground Beef, Beyond Breakfast Sausage Plant-Based Breakfast Patties Classic 7.4 oz, Beyond Breakfast Sausage Plant-Based Breakfast Patties Spicy 7.4 oz, Beyond Chicken Plant-Based Breaded Tenders Classic 8 oz, Beyond Meatballs Italian Style Plant-Based Meatballs 12 ct Classic 10 oz, and Beyond Breakfast Sausage Plant-Based Breakfast Links Classic 8.3 oz (collectively, the "Products"). As of December 2021, the Products were available for purchase in 130,000 retail and food service outlets in over ninety countries. In the United

---

[3] Section 101.9(c)(7)(ii) sets forth the manner by which to calculate the PDCAAS value.

States, 32,000 retail stores and 47,000 restaurants carry Beyond Meat offerings. Beyond Meat generated over $400 million in net revenue in 2020.

Beyond Meat has enlisted the help of celebrities, such as Lindsey Vonn and Chris Paul, to market its Products. It promotes the Products on social media platforms, including Instagram, X (formerly known as Twitter), and Facebook. One of its marketing campaigns, titled the "Future of Protein," targeted environmentally conscientious consumers and claimed that the Products allow consumers to obtain high-quality dietary protein while at the same time helping the environment.

Beyond Meat prominently displays the amount of protein its Products contain on their front labels. For example, as can be seen below, the front label of the Beyond Beef Plant-Based 16oz Patties states in large bold text, "20G of Plant Protein Per Serving." Doc. 12 ¶ 53. The NFP on the back of the product indicates that the advertised 20 grams of protein per serving equal 40% of the daily value. The product ingredient list on the back of the package indicates that the patties include pea and rice protein, as well as dried yeast and methylcellulose. Other Products include similar representations about their protein content.



*Id.* ¶¶ 53–54.

4

Plaintiffs' counsel commissioned independent laboratory testing that revealed that, using the nitrogen method, the quantity of protein in all but four of the Products is less than represented, and that each of the Products' %DV of protein, calculated using the PDCAAS method, is substantially less than represented.  According to Plaintiffs' testing, for example, the Beyond Beef Plant-Based 16oz Patties have 18 grams of protein per serving using the nitrogen method and 7%DV using the PDCAAS method.  The full results of Plaintiffs' testing follows:

| Beyond Meat Product | Claimed Protein (Grams per serving) | DV % Claim | Actual Protein Amount by Nitrogen (Grams per serving) | Actual DV% (Using PDCAAS) | % Difference Protein | % Difference DV |
|---|---|---|---|---|---|---|
| Sausage Plant-Based Dinner Links Hot Italian 14 oz | 16 | 25% | 13 | 5% | -18.75% | -80% |
| Beyond Sausage Plant-Based Dinner Sausage Links Brat Original 14 oz | 16 | 25% | 13 | 5% | -18.75% | -80% |
| Beyond Beef Plant-Based 16oz Patties | 20 | 40% | 18 | 6% | -10% | -85% |
| Beyond Beef Plant-Based Ground Beef | 20 | 40% | 19 | 7% | -5% | -82.5% |
| Beyond Breakfast Sausage Plant-Based Breakfast Patties Classic 7.4 oz | 11 | 22% | 10 | 4% | -9.1% | -81.8% |
| Beyond Breakfast Sausage Plant-Based Breakfast Patties Spicy 7.4 oz | 11 | 22% | 10 | 4% | -9.1% | -81.8% |
| Beyond Chicken Plant-Based Breaded Tenders Classic 8 oz | 11 | 16% | 13 | 2% | 18% | -87.5% |
| Beyond Meatballs Italian Style Plant-Based Meatballs 12 ct Classic 10 oz | 19 | 38% | 20 | 7% | 5.20% | -81.6% |
| Beyond Breakfast Sausage Plant-Based Breakfast Links Classic 8.3 oz | 8 | 16% | 7 | 3% | -12.50% | -81.3% |

*Id.* ¶ 60.

### III.    Plaintiffs' Purchases

Plaintiffs Angelique Roberts, Hannah Offutt, Dylan Rushing, Orlanda Hawthorne, Nisha Albert, Adam Sorkin, Dartisha Anderson, and Christine Borovoy reside in Illinois. Todd Miller and Rosemarie Ramirez live in New York, Richard Garcia resides in Colorado, Erica Nichols Cooks lives in Iowa, Jennifer Speer lives in Florida, Mary Yoon lives in California, Christopher Bates lives in Massachusetts, and Stan Zakinov lives in Texas. Each Plaintiff purchased at least one of the Products in their state of residence.

Miller, Cooks, and Speer relied on the representations about the amount of protein contained in the Products when making their purchases. All other Plaintiffs relied on both this representation and the representation about the %DV in the NFP. Additionally, Zakinov relied on Beyond Meat's marketing and packaging that the Products are all natural, organic, and healthy.

All Plaintiffs but Garcia, Cooks, Speer, and Zakinov indicate that they would consider repurchasing the Products if Beyond Meat corrected the alleged misrepresentations. Specifically, Miller would again purchase the Products in the immediate future if the Products actually contained the amount of protein currently stated on the labels. And Rushing would consider purchasing the Products again if Beyond Meat used the correct testing method for the %DV listed for protein in the Products' NFP. All others would consider purchasing the Products again if Beyond Meat corrected both the stated amount of protein on the Products' front label and used the correct testing method for the %DV listed for protein in the Products' NFP.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will

necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted). Rule 9(b) does not govern only claims of fraud; it applies to all allegations and averments of fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino*, 477 F.3d at 507.

## ANALYSIS

### I. Standing

The Court starts with standing, which "is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)). Not only must each plaintiff "have a 'personal stake' in the case," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted), but each plaintiff must also demonstrate standing with respect to each requested form of relief, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Here, Beyond Meat argues that Plaintiffs do not have standing to pursue injunctive relief or claims on behalf of consumers in states that have allegedly similar consumer fraud laws but in which Plaintiffs did not purchase any Products.

### A. Injunctive Relief

To establish standing to seek injunctive relief, Plaintiffs must allege (1) "an actual or imminent threat of suffering a concrete and particularized 'injury in fact,'" which (2) can fairly

8

be traced to the defendant's conduct and (3) a favorable judicial decision will likely prevent or redress. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019); *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) ("Because an injunction is a forward-looking remedy, a plaintiff seeking this form of relief has standing to sue for an alleged future injury only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Rather, a plaintiff "must face a 'real and immediate' threat of future injury" to have standing to pursue injunctive relief. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citation omitted).

When considering this requirement in the context of consumer fraud claims, the majority of courts in this district have concluded that a plaintiff's awareness of the alleged misrepresentations makes any future harm speculative, precluding that plaintiff from pursuing injunctive relief. *See Bruno v. Am. Textile Co., Inc.*, No. 22-CV-2937, 2023 WL 6976826, at *6 (N.D. Ill. Oct. 23, 2023) (collecting cases); *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702–03 (N.D. Ill. 2020) (same). *But see Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018) ("We hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer 'an actual and imminent, not conjectural or hypothetical' threat of future harm." (citation omitted)); *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2019 WL 398685, at *4–5 (N.D. Ill. Jan. 31, 2019) (following *Davidson* where the plaintiff alleged that he "would purchase

9

the product again in the future if he could be assured that the product was accurately labeled as to its SPF rating and/or that the product conformed to the SPF rating stated on the product packaging"). The Seventh Circuit appears to have endorsed the majority view in *Camasta v. Jos. A. Bank Clothiers, Inc.*, stating that a plaintiff who is aware of a defendant's deceptive practices is not likely to be harmed by those practices in the future and therefore lacks standing to pursue injunctive relief. 761 F.3d 732, 741 (7th Cir. 2014); *see In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-cv-5070, 2017 WL 2215025, at *8 (N.D. Ill. May 19, 2017) (observing that "*Camasta* uses the language of Article III standing" and noting that even if treated as dicta, *Camasta*'s reasoning is persuasive). Having reviewed the cases, the Court agrees with *Camasta* and the majority of courts in this district that Plaintiffs cannot pursue injunctive relief absent a concrete basis to conclude that, in the future, they will purchase the Products again and be deceived.[4] *See In re Herbal Supplements*, 2017 WL 2215025, at *7–8 (surveying split of authority but agreeing with those cases that conclude that consumer plaintiffs who are aware of the deceptive practice at issue cannot pursue injunctive relief).

Initially, Garcia, Cooks, Speer, and Zakinov do not allege that they would purchase the Products in the future if Beyond Meat corrected the alleged mislabeling. Because they cannot rely on the other Plaintiffs' allegations of their future intent to purchase the Products for standing

---

[4] Some courts to hold otherwise have noted that the majority reading would essentially "preclude[ ] standing for injunctive relief in practically all false advertising cases." *Carrol v. S.C. Johnsons & Son, Inc.*, No. 17-cv-05828, 2018 WL 1695421, at *3 (N.D. Ill. Mar. 29, 2018); *see also Davidson*, 889 F.3d at 970 (observing that its holding "alleviates the anomalies" that would arise if a plaintiff who has already been deceived could not pursue injunctive relief in false advertising cases). But as other courts in this district have noted, "public policy concerns do not confer Article III standing on a plaintiff who fails to allege an individual injury in fact." *Geske*, 503 F. Supp. 3d at 703 (citation omitted). Moreover, plaintiffs can continue to pursue injunctive relief in state court, where the same Article III standing requirements do not apply. *See Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 858 (N.D. Ill. 2021) ("Article III standing is a requirement for *federal*-court subject matter jurisdiction; it does not constrain *state*-court jurisdiction."). Finally, "as a practical matter, if a consumer-products maker . . . is held liable on the merits for past harm (that is, via monetary damages), then almost surely the company would stop the challenged practice lest suit after suit be brought against it for more and more monetary damages." *Id.*

purposes, Garcia, Cooks, Speer, and Zakinov do not have standing to pursue injunctive relief. *See Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share." (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974) (Burger, C.J., dissenting))).

As for the remaining Plaintiffs, they allege that they would purchase the Products again if Beyond Meat corrected the stated amount of protein on the front labels and used the correct method for calculating the %DV for protein listed in the NFP. They contend that without these corrections, they remain uncertain as to how much protein the Products actually contain and so cannot make informed decisions as to future purchases. But Plaintiffs do not allege that they continue to purchase the Products. And the fact that Beyond Meat continues to allegedly mislabel its products does not affect the standing inquiry. *See Guajardo v. Skechers USA, Inc.*, No. 419CV04104, 2021 WL 4302532, at *7 (C.D. Ill. Sept. 21, 2021) ("[W]hether a defendant continues its allegedly deceptive trade practices is irrelevant: What matters is whether a plaintiff is likely to be harmed by them again."). Because Plaintiffs acknowledge they now know of Beyond Meat's allegedly deceptive practices, they cannot claim that they face a risk of future deception. Thus, these Plaintiffs also do not have standing to pursue injunctive relief. *See Daly v. FitLife Brands, Inc.*, No. 1:22-CV-00762, 2023 WL 6388112, at *4 (N.D. Ill. Sept. 29, 2023) ("When a consumer knows about the allegedly false advertising, then that particular consumer is no longer at risk of future harm."); *Garza v. Nestle USA, Inc.*, --- F. Supp. 3d ----, 2023 WL 6141371, at *3 (N.D. Ill. Sept. 20, 2023) ("She now knows the truth about Good Start Grow, so a judicial decision requiring accurate labeling would not benefit her."); *Rice v. Dreyer's Grand Ice*

*Cream, Inc.*, 624 F. Supp. 3d 922, 926 (N.D. Ill. 2022) (argument that a plaintiff intends to purchase the product when the representations on the label are consistent with the product's composition "simply confirms that [the plaintiff] will not again purchase the product while being deceived by its front label").

**B.      Redress for Consumers in States with Similar Consumer Protection Laws**

In addition to claims based on the consumer fraud statutes of the states in which they reside, Plaintiffs seek to pursue claims under Michigan, Minnesota, Missouri, New Jersey, and Washington consumer fraud laws.  No named Plaintiff lives in these states or purchased any Products in these states.  Beyond Meat argues that, as a result, Plaintiffs cannot seek redress on behalf of consumers in these other states, treating the question as one of standing.  Plaintiffs, on the other hand, maintain that their ability to pursue such claims depends on a determination of whether they can represent a multi-state class under Rule 23, making the question premature at this stage.

Courts in this district are split as to the appropriate time to consider a challenge to a named plaintiff's ability to represent a class with respect to claims under laws of states in which the named plaintiff does not reside.  *See Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 998–1002 (N.D. Ill. 2017) (collecting cases following the different approaches to resolving the question). *Compare Rawson v. ALDI, Inc.*, No. 21-CV-2811, 2022 WL 1556395, at *5–6 (N.D. Ill. May 17, 2022) (collecting cases supporting the "prevailing view" that whether a plaintiff can represent a multi-state class with respect to claims under other states' consumer fraud statutes is best left for the class certification stage); *Cohan v. Medline Indus.*, No. 14 CV 1835, 2014 WL 4244314, at *2 & n.1 (N.D. Ill. Aug. 27, 2014) ("Standing in the class action context can and should be evaluated with respect to the individual named-plaintiff and later—in the event a class is certified—with respect to the class as a whole."), *with Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d

724, 731– 35 (N.D. Ill. 2015) (finding that plaintiffs needed a named representative from each named state to proceed on claims under those states' laws). The Court agrees with the prevailing view that the question relates to class certification, not Article III standing, and so will resolve this question at a later stage of the proceedings. *See Freeman*, 528 F. Supp. 3d at 859 ("[W]hen this case reaches the class-certification decisional stage, it might very well be that MAM will have solid arguments against certifying nationwide or multi-state classes . . . . But that is a question to be answered after discovery on the propriety of class certification—not right out of the box by an overbroad application of Article III standing to proposed class actions."); *see also Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016) ("[T]he question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing or jurisdiction."); *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1037–38 (N.D. Ill. 2017) ("[W]hether named plaintiffs can bring claims under the laws of other states and whether plaintiffs are adequate class representatives do not pose Article III barriers to subject-matter jurisdiction.").

Here, the named Plaintiffs have Article III standing to pursue their claims under the laws of the states in which they reside, having allegedly suffered injuries caused by Beyond Meat. Their "capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law claims on behalf of class members in those states." *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009). This makes class certification issues "logically antecedent" to the standing concerns. *Id.*; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997) (resolving "logically antecedent" class certification issues before standing issues because, without a certified class, the unnamed, proposed class members'

13

standing was irrelevant); *Payton*, 308 F.3d at 680–81 ("consider[ing] issues of class certification

prior to issues of standing," noting that "once a class is properly certified, statutory and Article

III standing requirements must be assessed with reference to the class as a whole, not simply

with reference to the individual named plaintiffs").[5] For this reason, the Court finds that

addressing standing now is premature and instead defers that inquiry to the class certification

stage.

## II. Preemption

Beyond Meat next argues that all of Plaintiffs' claims are preempted by the FDCA. The

FDCA does not provide a private right of action, meaning Plaintiffs may only seek relief

pursuant to related state-law claims. *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011).

"The latter right however, is tightly circumscribed by the FDCA's express preemption of state-

law theories that impose requirements 'not identical' to its own requirements." *Benson v. Fannie*

*May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019); *see* 21 U.S.C. § 343-1(a). For

purposes of preemption, the FDA has said that:

> "Not identical to" . . . means that the State requirement directly or
> indirectly imposes obligations or contains provisions concerning
> the composition or labeling of food, or concerning a food
> container, that: (i) Are not imposed by or contained in the
> applicable provision (including any implementing regulation) of
> section 401 or 403 of the act; or (ii) Differ from those specifically

---

[5] Beyond Meat argues that the Court should find *Amchem*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *Payton* distinguishable for the reasons stated in *Muir v. Nature's Bounty*, No. 15 C 9835, 2017 WL 4310650, at *8–9 (N.D. Ill. Sept. 28, 2017). In 2017, the *Muir* court determined that the Supreme Court and Seventh Circuit had not "directly addressed the question of whether a named plaintiff must have standing to assert each claim contained in the complaint before certification" and agreed with those courts that concluded that "the question of standing must be addressed before certification where the standing of the named plaintiff to assert the claims of the class is in question." *Id.* at *9. But, in 2018, the *Muir* court reconsidered and allowed the plaintiff to proceed with his multi-state claims "in light of the growing weight of authority that treats 'disjunctures' between a class representatives' claims and those of absent class members as a problem to be analyzed under the rubric of Rule 23, rather than the doctrine of statutory standing." *Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *8 (N.D. Ill. Aug. 1, 2018). The Court thus does not find the 2017 *Muir* decision or its reasoning persuasive.

imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act.

21 C.F.R. § 100.1(c)(4). The term "requirements" "sweeps broadly." *Turek v. Gen. Mills, Inc.*, 754 F. Supp. 2d 956, 958 (N.D. Ill. 2010) (quoting *Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 521 (1992)), *aff'd*, 662 F.3d 423. States can impose requirements that are identical to those imposed by the FDCA, but not different from or more burdensome than those requirements. *Chi. Faucet Shoppe, Inc. v. Nestle Waters N. Am., Inc.*, 24 F. Supp. 3d 750, 758 (N.D. Ill. 2014). In other words, to avoid preemption, a state law claim related to misleading labeling must allege a violation of the FDCA or its regulations. *Turek*, 662 F.3d at 426; *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."); *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) ("The preemption analysis turns on whether the challenged statements are authorized by the FDA's regulations or other pronouncements of similar legal effect.").

Plaintiffs assert that Beyond Meat's labels are false and misleading for three reasons: (1) Beyond Meat improperly uses the nitrogen method, instead of PDCAAS, to calculate the protein nutrient content claims on the Products' front labels; (2) Beyond Meat lists the incorrect amount of protein in the Products' NFP, even using the nitrogen method; and (3) Beyond Meat does not use the PDCAAS method to determine the %DV in the Products' NFP. Preemption is an affirmative defense, making dismissal at the pleading stage appropriate only if Plaintiffs have pleaded themselves out of court. *See Calderon v. Procter & Gamble Co.*, --- F. Supp. 3d ----, 2023 WL 3627797, at *3 (N.D. Ill. May 24, 2023); *cf. Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020) ("With a narrow and pragmatic exception for a plaintiff who has pleaded herself out of court, the appropriate vehicle for resolving an affirmative defense is a motion for

15

judgment on the pleadings under Rule 12(c), not a Rule 12(b)(6) motion."). The Court thus turns to whether Plaintiffs have pleaded themselves out of court as to any of these theories of liability.

### A. Claims Based on Beyond Meat's Alleged Failure to Use the PDCAAS Method to Calculate the Amount of Protein Advertised on the Products' Front Labels

The Court first considers whether the FDCA preempts Plaintiffs' front-label protein content claims. The FDCA provides that food labels may not be "false or misleading." 21 U.S.C. § 343(a)(1). Section 101.13(i)(3) allows a nutrient content claim about the amount of protein in the product as long as the statement "is not false or misleading in any respect." 21 C.F.R. § 101.13(i)(3). As already discussed, "compliance with requirements for nutrient content claims" is "determined using the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9." *Id.* § 101.13(o). Section 101.9 provides that manufacturers may calculate the amount of protein listed in the NFP using either the nitrogen or PDCAAS methods. *Id.* § 101.9(c)(7). But if a label includes a protein content claim, such as that included on the front labels of the Products in this case, § 101.9 requires the manufacturer to display the PDCAAS-corrected protein content as a %DV figure in the NFP in addition to displaying the protein quantity in grams. *Id.* § 101.9(c)(7)(i).

Plaintiffs argue that the front-label statements on the Products mislead consumers into believing that the Products' protein content is higher in both quality and quantity than it actually is because Beyond Meat uses the nitrogen method instead of the PDCAAS method to calculate the displayed amount of protein. Plaintiffs contend that the FDCA requires Beyond Meat to use the PDCAAS method for any protein content claims on the Products' front labels. Beyond Meat, however, argues that the FDCA allows front-label protein content claims to use either the nitrogen or PDCAAS methods, meaning Plaintiffs' claims seek to impose additional requirements not required by the FDCA and its implementing regulations and so are preempted.

16

In 2016, the Court considered the same question and agreed with Plaintiffs that § 101.9(c)(7) requires the use of the PDCAAS method for any protein content claims, in other words, that a manufacturer could not use the nitrogen method to calculate the amount of protein it advertised a product contained on the product's front label. *Gubala v. HBS Int'l Corp.* ("*HBS*"), No. 14 C 9299, 2016 WL 2344583, at *3 (N.D. Ill. May 4, 2016). A number of other courts in this district and across the country found similarly. *See, e.g.*, *Minor v. Baker Mills, Inc.*, No. 20-CV-02901, 2020 WL 11564643, at *3 (N.D. Cal. Nov. 12, 2020) ("It would be incongruous, to say the least, to require that a manufacturer promoting the amount of protein in its products to use the amino acid method when disclosing percentage of Daily Value, but still permit it to use a potentially misleadingly higher figure for the grams calculated under the nitrogen method elsewhere on the packaging. Although the regulations certainly could have been written more clearly to prohibit such a practice, when read as a whole, it is apparent that the provision permitting use of the nitrogen method applies only where no nutrient claim is made."); *Porter v. NBTY, Inc.*, No. 15 CV 11459, 2019 WL 5694312, at *4 (N.D. Ill. Nov. 4, 2019) ("If the nitrogen method is exploited to inflate protein content, then the amount of protein listed on the front label may be false or misleading, even when that same number listing the total grams of protein on the nutrition panel is technically permitted by law."); *Ulrich v. Probalance, Inc.*, No. 16 C 10488, 2017 WL 3581183, at *5 (N.D. Ill. Aug. 18, 2017) (front-label claim not preempted because plaintiffs arguably alleged that the use of a protein isolate reduced the digestibility of the protein, meaning the products effectively had less protein than advertised); *Gubala v. CVS Pharm., Inc.* ("*CVS*"), No. 14 C 9039, 2016 WL 1019794, at *12 (N.D. Ill. Mar. 15, 2016) (claim on front-label using nitrogen method of calculation could be misleading given requirement that

the %DV in the NFP be calculated using the PDCAAS method where a protein content claim is made).

Upon closer examination of the regulations and a review of subsequent caselaw, however, the Court finds that it erred in *HBS* and disagrees with those courts that found similarly. The Court agrees with Plaintiffs that, because Beyond Meat uses the nitrogen method to make a protein content claim, § 101.9(c)(7)(i) requires it to calculate the corrected amount of protein using the PDCAAS method and display that amount as a %DV in the NFP. But the Court disagrees that this requirement carries over to the method Beyond Meat must use in calculating the amount of protein displayed on the Products' front labels. "[S]ection 101.13(o) expressly allows Defendants to make a nutrient content claim based on the nitrogen method, as they have done here." *Nacarino v. Kashi Co.*, 77 F.4th 1201, 1207 (9th Cir. 2023). As the Ninth Circuit recently stated, "the interlocking provisions of the FDA's regulatory scheme provide that: (1) the nitrogen method may be used to calculate protein quantity in the NFP and to make quantitative protein claims; and (2) if a product label includes a protein claim *outside* the NFP, section 101.9(c)(7)(i)'s trigger provision requires the manufacturer to also include the PDCAAS-corrected percent daily value *inside* the NFP." *Id.* at 1209 (citations omitted); *see also Guerra v. KIND, LLC*, No. 22-CV-06654, 2023 WL 3436093, at *4 (N.D. Cal. May 11, 2023) ("Critically—and paradoxically—*even where a protein content claim triggers the %DV requirement*, the FDCA does *not* require that the protein content claim itself be expressed using the 'corrected' protein figure."); *Chong v. Kind LLC*, 585 F. Supp. 3d 1215, 1217–19 (N.D. Cal. 2022) ("[A] correct reading of the regulations establishes that producers may state grams of protein even outside the Nutrition Facts panel calculated by the nitrogen method, and without adjustment for digestibility."). This means that Plaintiffs' claims that Beyond Meat had to use

18

the PDCAAS method for its protein content claims on the Products' front labels are preempted because Plaintiffs seek to impose requirements on Beyond Meat beyond those required by the FDCA. *See Nacarino*, 77 F.4th at 1209 ("Read together, sections 101.13(o) and 101.9(c)(7) permit manufacturers to make protein claims that state protein quantity measured using the nitrogen method."); *Brown v. Van's Int'l Foods, Inc.*, No. 22-CV-00001, 2022 WL 1471454, at *6 (N.D. Cal. May 10, 2022) ("Because Brown's first challenge to Sara Lee's front-label would use California state law to impose requirements—adjusting the total protein amount for digestibility—that the FDA does not, her first argument is preempted by the FDCA."); *Hinkley v. Baker Mills, Inc.*, No. 2:21-CV-00221, 2022 WL 1767108, at *1–2 (D. Utah Apr. 26, 2022) (claim preempted where it sought to prohibit use of the nitrogen method to measure protein on the front label).

Although not necessary to its analysis, the Court notes that its conclusion is further supported by the FDA's guidance on its webpage concerning front-label claims. In a question-and-answer published in 2022 addressing which method manufacturers should use for protein content claims, the FDA indicated that either the nitrogen or PDCAAS methods may be used to determine compliance for protein content claims and noted that the existence of two methods for compliance was "by design." *Label Claims*, Industry Resources on Changes to Nutrition Facts Label, FDA (Dec. 7, 2023), https://www.fda.gov/food/food-labeling-nutrition/industry-resources-changes-nutrition-facts-label#LabelClaims; *see also Guerra*, 2023 WL 3436093, at *4 ("'By design,' therefore, the FDCA permits products to advertise unadjusted protein claims on the product's front packaging and in the NFP, and include the adjusted protein figure in the NFP as a percentage (not an absolute gram figure)."). The weight accorded to this guidance "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its

consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Having consulted these factors, the Court agrees with Beyond Meat that the FDA's guidance, which is in line with the Court's reading of the regulations, has persuasive value. *See Nacarino*, 77 F.4th at 1213 (finding agency's interpretation of § 101.13(o) on its website persuasive). The FDA's guidance thus further supports the Court's conclusion that the FDCA preempts Plaintiffs' front-label protein content claims.[6] *See Brown v. Natures Path Foods, Inc.*, No. 21-CV-05132, 2022 WL 717816, at *6–7 (N.D. Cal. Mar. 10, 2022) (front-label claim preempted because "the FDA has now made clear that its regulations do not require protein content claims to adjust for digestibility or to be calculated using amino acid contest testing"); *Swartz v. Dave's Killer Bread, Inc.*, No. 4:21-CV-10053, 2022 WL 1766463, at *4 (N.D. Cal. May 20, 2022) ("[T]he Court finds that the FDA's explicit statement that nutrient content claims may be based on total protein, calculated using the nitrogen-content method, is dispositive. . . . The regulations do not state whether nutrient content claims must indicate total or corrected protein or specify a required method of calculation. The guidance merely confirms that there is no preferred or required method. If, as plaintiff alleges, the FDA required that nutrient content claims show corrected protein, it would have said so, as it does at various other points in the regulation.").

## B. Claims Based on the Alleged Misrepresentation of the Amount of Protein in the Products

Next, the Court considers whether the FDCA preempts Plaintiffs' claims that Beyond Meat misrepresents the amount of protein its Products contain even when using the nitrogen

---

[6] As another court noted in examining this question, all the cases that Plaintiffs cite supporting their position that the regulations require the use of the PDCAAS method for protein content claims were decided before the FDA's guidance, with virtually all courts considering the question after the FDA's guidance disagreeing. *See Dunn v. Ancient Brands, LLC*, No. 5:21-CV-390, 2023 WL 6037853, at *6 (N.D.N.Y. Sept. 15, 2023) (collecting cases).

method.  Beyond Meat argues that preemption applies because the FDA's food labeling regulations allow for a margin of error before a food is deemed misbranded and Plaintiffs' independent testing shows that the Products' stated protein content falls within this margin of error.  The Court, however, agrees with Plaintiffs that this remains a factual question inappropriate for resolution at this stage because Plaintiffs have not pleaded themselves out of court on the issue.  *See Benson*, 944 F.3d at 645 (finding error in the dismissal of a claim based on preemption where the plaintiff did not plead herself out of court on the affirmative defense).

Section 101.9(g) provides how to determine whether the amount of protein stated on a food label complies with the regulations.  Where a protein is a Class I nutrient, defined as "[a]dded nutrients in fortified or fabricated foods," 21 C.F.R. § 101.9(g)(3)(i), "the nutrient content of the composite must be formulated to be at least equal to the value for that nutrient declared on the label," *id.* § 101.9(g)(4)(i).  But where a protein "meets the definition of a Class II nutrient," defined as "[n]aturally occurring (indigenous) nutrients," *id.* § 101.9(g)(3)(ii), "the nutrient content of the composite must be at least equal to 80 percent of the value for that nutrient declared on the label," *id.* § 101.9(g)(4)(ii).  The regulations further provide that "[w]hen a nutrient is naturally occurring (indigenous) in a food or an ingredient that is added to a food, the total amount of such nutrient in the final food product is subject to class II requirements, except that when an exogenous source of the nutrient is also added to the final food product, the total amount of the nutrient in the final food product (indigenous and exogenous) is subject to class I requirements."  *Id.* § 101.9(g)(3)(ii).  The safe harbor for Class II nutrients exists to account for differences "in season, soil, weather, and 'processing that a food undergoes.'"  *Muir v. NBTY, Inc.*, No. 15 C 9835, 2016 WL 5234596, at *7 (N.D. Ill. Sept. 22, 2016) (quoting Food

Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision, Format for

Nutrition Label, 58 Fed. Reg. 2079-01, 2161 (Jan. 6, 1993)).

Beyond Meat claims that the protein in its Products falls within Class II because it comes

from peas, rice, and yeast. Plaintiffs, however, note that the Products' labels indicate that they

contain "pea protein," "rice protein," and "dried yeast," Doc. 12 ¶ 53, which they contend are not

"naturally occurring" nutrients like peas and rice may be. In other words, they contend that

"because a manufacturer cannot simply extract the protein out of a pea or grain of rice but must

instead rely on industrial mechanical and chemical process," the Products "are not merely

comprised of natural ingredients occurring in their natural form" but instead include

manufactured proteins that can be "controlled for their macro nutrient contents, thereby

removing any natural variances." Doc. 20 at 17–18. In reply, Beyond Meat insists that the

description of the protein is not determinative and that the way it derives the protein for its

Products makes no difference to the Class I versus Class II categorization when the protein

comes from naturally occurring ingredients. While this argument seems somewhat persuasive in

light of the relevant definitions in the regulations, the Court cannot determine whether the

protein used in the Products qualifies as a Class I or Class II nutrient without additional facts

about the source of the protein and the composition of the Products. *See Potter v. Potnetwork

Holdings, Inc.*, No. 19-24017, 2020 WL 1516518, at *4 (S.D. Fla. Mar. 30, 2020) (refusing to

apply safe harbor at the motion to dismiss stage because the court could not determine whether

the products should be classified as Class I or Class II nutrients without additional facts). Thus,

the Court defers resolution of this question until after discovery. *See Benson*, 944 F.3d at 645.

### C.    Use of Independent Testing to Support Plaintiffs' Claims

Finally, Beyond Meat argues that the Court should find Plaintiffs' claims preempted because their independent testing did not meet the FDA's standard for determining whether a product is misbranded.  Section 101.9(g) states that compliance with § 101.9 "shall be determined" by conducting a twelve-sample test.  21 C.F.R. § 101.9(g).  The twelve-sample test involves choosing one subsample for each of twelve different "randomly chosen shipping cases, to be representative of a lot" and then testing those subsamples in accordance with the method described in § 101.9(c).  *Id.* § 101.9(g)(2).  A lot is defined as a "[a] collection of . . . units of the same size, type, and style produced under conditions as nearly uniform as possible."  *Id.* § 101.9(g)(1).

Beyond Meat cites to several district court opinions that have dismissed similar claims based on this argument.  *See, e.g.*, *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2018 WL 2431981, at *4 (N.D. Ill. May 30, 2018) (to make claim plausible to avoid preemption, "plaintiff must do more than insert a conclusory allegation that the testing was identical" to the FDA's requirements); *Rubio v. Orgain, Inc.*, No. EDCV 18-2237, 2019 WL 1578379, at *3–4 (C.D. Cal. Mar. 5, 2019) (collecting cases where courts dismissed false labeling claims for failure to allege that product testing complied with § 101.9(g)); *Forouzesh v. CVS*, No. 2:18-CV-04090, 2019 WL 652887, at *5 (C.D. Cal. Feb. 15, 2019) (because the plaintiff did not allege his testing complied with FDA regulations, his claims sought to require the defendant to apply a methodology different from that required by the FDA and so were preempted); *Mee v. I A Nutrition, Inc.*, No. C-14-5006, 2015 WL 2251303, at *3–4 (N.D. Cal. May 13, 2015) (complaint supported by testing that is not compliant with § 101.9(g) is preempted); *Salazar v. Honest Tea,*

*Inc.*, 74 F. Supp. 3d 1304, 1313 (E.D. Cal. 2014) (state law claims preempted where the plaintiff failed to allege she conducted a twelve-sample test).

Plaintiffs implicitly concede that they did not conduct a twelve-sample test, instead arguing that the twelve-sample test requirement applies only to the FDA and that they do not need to produce such evidence at this stage. Plaintiffs point to a number of cases from this district and others supporting their position. *See, e.g.*, *Carrol*, 2018 WL 1695421, at *3 ("Courts in this district have held that plaintiffs can sufficiently allege mislabeling claims based on preliminary testing that was not completed in compliance with FDA standards."); *Muir*, 2016 WL 5234596, at *5–6 (a plaintiff need not plead compliance with the twelve-sample test at the pleading stage); *CVS*, 2016 WL 1019794, at *8–9 ("Whether independent testing along the lines of § 101.9(g)(2) confirms Plaintiff's claim of overstated protein content is an issue of proof, and Plaintiff does not need to prove his case at the pleading stage of the case."). The Court finds this line of caselaw more persuasive, particularly in light of the Seventh Circuit's reminder that preemption is an affirmative defense not typically suited for resolution on a Rule 12(b)(6) motion.[7] *See Benson*, 944 F.3d at 645; *see also Calderon*, 2023 WL 3627797, at *5 ("Calderon's test results can certainly be challenged at a later stage but it is sufficient for Calderon to rely on these results at the pleading stage."); *Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1122–24 (N.D. Cal. 2023) ("Pleading that one has conducted independent, non-FDA compliant testing that suggests an unreasonable overage does <u>not</u> suggest that one

---

[7] Indeed, as noted in *CVS*, the opposing line of cases cited by Beyond Meat that require compliance with the twelve-sample test at the pleading stage actually originated in a case decided on summary judgment after the parties had an opportunity to conduct discovery. *CVS*, 2016 WL 1019794, at *7 (tracing the origin of the cases on which defendants rely to *Vital v. One World Co.*, No. SACV 12-00314, 2012 WL 13029487, at *5 (C.D. Cal. Nov. 30, 2012)). This further suggests that compliance with the twelve-sample test is not a pleading requirement to avoid preemption. *See also Hollins v. Walmart Inc.*, 67 F.4th 1011, 1017–18 (9th Cir. 2023) (affirming finding of preemption at the summary judgment stage, after plaintiff had the opportunity to perform testing on twelve samples).

<u>could not</u> support allegations of unreasonable overage with FDA-compliant testing. . . .

Requiring plaintiffs to allege that they complied with the FDA testing method would be requiring

them to 'provide evidence in support of [their] claims at the pleading stage.'" (alteration in

original) (citation omitted)).  Plaintiffs' allegations, bolstered by the third-party testing results

summarized in the consolidated complaint, plausibly suggest that Beyond Meat has

misrepresented the amount of protein in its products under either the nitrogen or PDCAAS

methods.[8]  Because Plaintiffs need not plead compliance with § 101.9(g)(2), the Court cannot

find Plaintiffs' claims preempted on these grounds at this time, although Beyond Meat may

reraise the issue at a later stage if appropriate.

### III. Sufficiency of the Allegations

### A. Statutory Claims

Beyond Meat next moves to dismiss Plaintiffs' claims under the various state statutes for

the same reasons it argues preemption applies: that the state laws do not apply where Beyond

Meat has complied with the applicable federal or state laws.  But because the Court has found

that Plaintiffs have plausibly alleged violations of the FDA regulations with respect to all but

their claims that the front-label protein content claims must use the PDCAAS method, the Court

will not dismiss the remaining statutory claims on this basis.  Instead, Beyond Meat's

compliance with the FDA regulations remains a factual question subject to further exploration in

discovery.

---

[8] Beyond Meat highlights numerous alleged pleading deficiencies with Plaintiffs' allegations of independent testing, claiming that Plaintiffs needed to plead various details about the independent testing they undertook, such as the laboratory that conducted the testing and the methodology used, and also should have attached the results of that testing to the consolidated complaint instead of merely including an attorney-produced chart summarizing the results.  While Plaintiffs indeed could have done more to describe their testing methods and results, the Court finds that Beyond Meat asks for too much of Plaintiffs at this time.

B.       **Warranty Claims**

Plaintiffs bring claims for breach of express and implied warranties under state law and

the MMWA.[9]  The MMWA creates a federal cause of action for breach of written and implied

warranties under state law.  15 U.S.C. § 2310(d)(1).  A claim under the MMWA depends on the

existence of a viable underlying state law warranty claim.  *Zylstra v. DRV, LLC*, 8 F.4th 597, 609

(7th Cir. 2021).  To state a claim for breach of express warranty, Plaintiffs must allege "that the

seller: (1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of

the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or

promise."  *Aquino v. C.R. Bard, Inc.*, 413 F. Supp. 3d 770, 787 (N.D. Ill. 2019).  In Illinois, a

product breaches the implied warranty of merchantability if it is not "fit for the ordinary

purposes for which such goods are used."  810 Ill. Comp. Stat. 5/2-314(2)(c).

Plaintiffs premise their warranty claims on (1) Beyond Meat's statements of the amount

of protein on the Products' front labels, (2) statements that the Products are made from "natural"

ingredients and without "artificial" or "synthetic" ingredients, and (3) the stated %DV for protein

in the Products' NFP.  Plaintiffs maintain that all of these statements are verifiably false.

Beyond Meat, however, argues that their Products' labels do not create any warranties, with the

labels instead merely amounting to product descriptions that do not suggest that the Products are

---

[9] The breach of warranty claims and the MMWA claim are governed by the law of Plaintiffs' home states, as that is where they purchased the Products and where they were injured.  *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 785–86 (N.D. Ill. 2016).  The parties in this case do not highlight any differences in the various state laws at issue here, and so the Court analyzes these claims under Illinois law, citing to other states' laws as relevant.  *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009); *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 25 ("[A] choice-of-law determination is required only when the moving party has established an actual conflict between state laws.").

defect free.[10] *See, e.g.*, *Fernandez v. Atkins Nutritionals, Inc.*, No. 3:17-cv-01628, 2018 WL 280028, at *13 (S.D. Cal. Jan. 3, 2018) (dismissing warranty claims because the label merely described the contents of the product, which could mislead consumers but was not verifiably false); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *17 (E.D.N.Y. Aug. 29, 2013) ("all natural" description on label "does not warrant a product free from defect" or "constitute a promise that the product 'will meet a specified level of performance over time'" (citations omitted)).

The Court acknowledges that, as Beyond Meat points out, some courts have found that product labels do not create warranties, but these courts have relied mainly on the MMWA's definition that a "written warranty" consists of an "affirmation of fact or written promise" that the product "is defect free or will meet a specified level of performance over a specified period of time." 15 U.S.C. § 2301(6)(A); *see In re Sears, Roebuck & Co*, No. MDL-1703, 2006 WL 1443737, at *4 (N.D. Ill. May 17, 2006) (dismissing MMWA claim because the phrase "Made in the USA" did not meet the MMWA's requirement that a warranty amount to a promise that a product would be defect free or perform at a certain level). Here, however, Beyond Meat does not cite anything suggesting that the state law warranty claims must meet the MMWA's definition. *Cf. Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011) ("[F]or all practical purposes, the MMWA operates as a gloss on the Andersons' state law breach of warranty claims."). Illinois does not define a warranty to require a representation about the product being defect free. *See* 810 Ill. Comp. Stat. 5/2-313(b) ("Any description of the goods

---

[10] The Court cannot find any representation on the labels reproduced in the consolidated complaint that specifically state that the Products use only "natural" ingredients and do not contain "artificial" or "synthetic" ingredients. But Beyond Meat does not seek to dismiss the warranty claims on this basis, and so the Court proceeds to consider whether such statements could form the basis of a warranty claim. *Cf. Aquino*, 413 F. Supp. 3d at 787 (dismissing breach of express warranty claim where the plaintiff did not sufficiently allege the terms of the warranty or attach it to the complaint).

which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."); 810 Ill. Comp. Stat. 5/2-314(2)(f) (merchantable goods must "conform to the promises or affirmations of fact made on the container or label if any"). Thus, the Court finds more persuasive decisions from courts that have not relied on the MMWA's warranty definition and instead have allowed warranty claims to proceed based on representations on product labels about the contents of the product. *See, e.g.*, *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2023 WL 7531230, at *8 (N.D. Ill. Nov. 13, 2023) (allowing warranty claims based on representations that products were "gentle," "natural," and "healthy"); *Bakopoulos v. Mars Petcare US, Inc.*, 592 F. Supp. 3d 759, 766 (N.D. Ill. 2022) (allowing warranty claims based on defendant's representations that the products were "limited ingredient" and had "no corn, wheat, soy, or chicken"); *Mason v. Reed's Inc.*, 515 F. Supp. 3d 135, 146 (S.D.N.Y. 2021) (collecting cases under New York law finding that product labels and advertisements, including statements like "all natural" or "no preservatives," create actionable warranties).[11] Therefore, the Court finds Plaintiffs have sufficiently alleged their warranty claims.

### C. Compliance with Rule 9(b)

Next, Beyond Meat argues that all of Plaintiffs' claims must satisfy Rule 9(b) yet fail to do so. In making this argument, Beyond Meat conflates the elements required to allege a common law fraud claim with the particularity requirement of Rule 9(b), arguing essentially that each of Plaintiffs' claims must also meet the requirements of a common law fraud claim. *See*

---

[11] The Court also notes that in *Fernandez*, one of the cases on which Beyond Meat relies, the court distinguished the claim made there, that a net carbohydrate claim amounted to an affirmation regarding the method of calculation for that claim, from verifiable warranty claims, such as that a product is "100% Natural" or "flushable." 2018 WL 280028, at *13. Here, Plaintiffs' claims fall in line with those that *Fernandez* found created "an affirmation about the contents of the product," *id.*, suggesting that *Fernandez* actually supports Plaintiffs' position.

Doc. 17 at 24. But Beyond Meat's argument sweeps too broadly, as all of Plaintiffs' claims do not necessarily sound in fraud or require the pleading of each common law fraud element. *Cf. Borsellino*, 477 F.3d at 507 (claims "premised upon a course of fraudulent conduct" implicate Rule 9(b)'s particularity requirement). The Court thus considers this argument only as it relates to the state consumer fraud claims premised on deceptive as opposed to unfair practices, as well as the common law fraud claims.[12]

To state a common law fraud claim under Illinois law, Plaintiffs must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996)). To state an ICFA deceptive practices claim, Plaintiffs must allege (1) a deceptive practice by Beyond Meat, (2) Beyond Meat's intent that Plaintiffs rely on the deceptive practice, (3) the deceptive practice occurred during a course of conduct involving trade or commerce, and (4) the deceptive practice proximately caused Plaintiffs actual damage. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). Rule 9(b) requires Plaintiffs to "describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (citation omitted) (internal quotation marks omitted).

Beyond Meat focuses on whether Plaintiffs have sufficiently alleged its intent to deceive, claiming that the allegations suggest at most Beyond Meat's knowledge of falsity, which does

---

[12] The parties do not make clear whether any of the consumer fraud claims do not sound in fraud and so would be subject to the more lenient Rule 8(a) pleading standards. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738–39 (7th Cir. 2019) (discussing the different pleading standards for claims premised on deceptive and unfair conduct under ICFA). As the Seventh Circuit has pointed out, "simply adding language of 'unfairness' instead of 'misrepresentation'" may not "alter the fact that [a plaintiff's] allegations are entirely grounded in fraud" for purposes of their consumer fraud claims. *Camasta*, 761 F.3d at 737.

29

not suffice under Rule 9(b).[13]  Initially, for purposes of their ICFA claim, Plaintiffs need not

allege intent to deceive, but instead only "that the defendant committed a deceptive or unfair act

and intended that the plaintiff rely on that act."  *Wigod*, 673 F.3d at 575.  Here, Plaintiffs have

sufficiently alleged that Beyond Meat intended for Plaintiffs to rely on the representations made

on the Products' labels.  *See Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1043 (N.D. Ill.

2021) ("GEICO certainly intended that consumers rely on the GEICO Giveback program in

deciding to purchase or renew a policy, which is the very purpose of corporate promotions.");

*Freeman*, 528 F. Supp. 3d at 865 (finding the plaintiff alleged "a plausible inference of intent"

where he "alleged that MAM seeks to convince consumers to buy its products based on its

advertising campaign around their safety and benefits for children").  Thus, the Court does not

find Rule 9(b) requires more from Plaintiffs with respect to intent for their consumer fraud

claims.

As for the common law fraud claims, Plaintiffs conclusorily allege that Beyond Meat

"knew or should have known" that its representations are false because "Defendant is a large

scale and sophisticated company that has operated in the plant-based meat industry for over a

decade with major, national distribution," and so "intentionally, knowingly, and recklessly"

made the representations.  Doc. 12 ¶¶ 303–04.  Plaintiffs argue that this meets Rule 9(b) because

Rule 9(b) allows them to allege intent and knowledge generally.  But as many courts in this

district and across the country have found in similar situations, alleging the defendant's

knowledge of a misrepresentation does not sufficiently suggest fraudulent intent under Rule 9(b).

*See, e.g.*, *Bruno*, 2023 WL 6976826, at *5, 7 (collecting cases and joining other courts in finding

---

[13] To the extent that Beyond Meat intended to challenge other aspects of Plaintiffs' claims for failure to comply with Rule 9(b), the Court finds any such arguments undeveloped and waived.  *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

that an allegation of fraudulent intent based on the defendant's knowledge of misrepresentations was conclusory under Rule 9(b)); *Rudy v. D.F. Stauffer Biscuit Co.*, 666 F. Supp. 3d 706, 723–24 (N.D. Ill. 2023) (allegation that fraudulent intent was shown through the defendant's knowledge of the misrepresentations "does not meet even Rule 9(b)'s more generous pleading standard allowing knowledge of intent to be alleged generally" and instead "is pure *ipse dixit*"); *Acosta-Aguayo v. Walgreen Co.*, No. 22-cv-00177, 2023 WL 2333300, at *7 (N.D. Ill. Mar. 2, 2023) (allegations about knowledge and intent were too conclusory, particularly given the qualification in the complaint that the defendant "knew or should have known" of the misrepresentations); *see also Davis v. Hein Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) ("A conclusory assertion of intent may be sufficient if it is supported by facts giving rise to a strong inference of fraudulent intent. This inference may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. The simple knowledge that a statement is false is not sufficient to establish fraudulent intent, nor is a defendants' generalized motive to satisfy consumers' desires [or] increase sales and profits." (alteration in original) (citations omitted) (internal quotation marks omitted)). The Court thus dismisses Plaintiffs' common law fraud claims for failure to comply with Rule 9(b).

Finally, Beyond Meat argues that Zakinov's fraud-based claims fail to meet Rule 9(b) because he has not sufficiently alleged how the Products are not "all natural, organic, and healthy." *See* Doc. 12 ¶ 83. Zakinov is the only Plaintiff to claim he relied on Beyond Meat's representations that its Products are natural, organic, and healthy and did not know that the Products contained artificial, synthetic materials.[14] This contention about not knowing of the use

---

[14] As Plaintiffs point out, Zakinov also alleges reliance on the alleged misrepresentations concerning protein quality and quantity, which Beyond Meat has not challenged under Rule 9(b).

of artificial, synthetic materials appears to be based on the inclusion of methylcellulose in the

Products. *See id.* ¶¶ 114, 260, 272, 322. But as Beyond Meat points out, the consolidated

complaint includes the Beyond Burger's ingredient list, which clearly identifies methylcellulose

as an ingredient.[15] *Id.* ¶ 53. Plaintiffs respond that their issue is with the "artificial process by

which [the methylcellulose] was made, not just the mere presence." Doc. 20 at 24. Regardless,

because the consolidated complaint does not provide any specifics regarding the alleged

misrepresentations concerning the presence of artificial, synthetic materials, it does not meet

Rule 9(b)'s particularity requirement. Thus, the Court dismisses Zakinov's fraud-based claims,

including the statutory ones, premised on the presence of non-natural, artificial, or synthetic

materials in the Products.[16]

      **D.**    **Common Law Claims**

Next, Beyond Meat argues that Plaintiffs' common law claims all fail because Plaintiffs

have not identified the state laws on which they rely. Beyond Meat contends that Plaintiffs'

failure to identify the specific state laws they seek to invoke fails to put it on notice of the claims

at issue. Plaintiffs have, however, identified the state in which each Plaintiff resides, and

Beyond Meat could have made arguments for dismissal based on these states' laws. Moreover,

Beyond Meat has not identified any state-specific issues related to the common law claims, and

courts in this district considering multi-district litigation have declined to rule on state-specific

issues "in an omnibus fashion" at the pleading stage. *See In re Recalled Abbott Infant Formula*

*Prods. Liab. Litig.*, No. 22 C 4148, 2023 WL 3585639, at *3 (N.D. Ill. May 22, 2023); *cf. In re*

---

[15] The consolidated complaint does not include the ingredient lists for the remaining Products that are at issue in this case.

[16] Although the Court dismisses the fraud-based claims related to alleged misrepresentations about the presence of artificial and synthetic materials in the Products, the Court does not understand the warranty claims concerning natural products to be subject to Rule 9(b) and so those remain pending as discussed above.

*Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2014 WL 7365872, at

*10 (N.D. Ill. Dec. 23, 2014) ("[I]t makes sense to address differences in state law only to the

extent that this would reduce the discovery burden in a material way.  With the exception of

Michigan and Texas, the two states in which defendants contend relief is completely barred,

defendants will have to engage in discovery for cases involving every other state at issue.  In

other words, it does not appear that rulings favorable to the defendants concerning the particulars

of other state law claims would reduce in a material way the overall burden of discovery.

Accordingly, with the exception of Michigan and Texas, the Court defers deciding individual

state law issues.").  The consolidated complaint provides Beyond Meat with the factual basis for

the common law claims, which suffices to allow Beyond Meat to answer these claims to the

extent the Court has not otherwise found that they suffer from pleading deficiencies or cannot

similarly proceed.  That said, should Plaintiffs file an amended complaint to address any of the

other pleading deficiencies addressed herein, the Court encourages Plaintiffs to make clearer

under which states' laws they seek to pursue their common law claims.

        **E.**      **Unjust Enrichment Claim**

        Finally, Beyond Meat asks the Court to dismiss Plaintiffs' unjust enrichment claim,

contending that the Seventh Circuit has rejected unjust enrichment claims based on deceptive

labeling.  Beyond Meat relies on the Seventh Circuit's holding in *Cleary v. Philip Morris Inc.*

that a claim that "the mere violation of a consumer's legal right to know about a product's risks,

without anything more, cannot support a claim that the manufacturer unjustly retained the

revenue from the product's sale to the consumer's detriment."  656 F.3d 511, 520 (7th Cir.

2011).  But Beyond Meat asks the Court to read too much into *Cleary*, ignoring the fact that the

Seventh Circuit qualified its holding, which it limited to the bare allegation of a "violation of a

consumer's legal right" without anything more, such as proof of "personal damages, deception, or reliance." *Id.* at 519–20 (noting that the case would be different if the plaintiffs had not disclaimed the need to show "personal damages, deception, or reliance"). Here, Plaintiffs have alleged more than just a violation of a legal right, meaning that *Cleary* does not bar their unjust enrichment claim. *See, e.g.*, *Calderon*, 2023 WL 3627797, at *7 (allowing unjust enrichment claim to proceed based on allegedly false and misleading labeling). And because at least some of Plaintiffs' other claims based on the same conduct survive Beyond Meat's motion to dismiss, the unjust enrichment claim may proceed to the same extent. *See Cleary*, 656 F.3d at 517 ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Beyond Meat's motion to dismiss [16]. The Court dismisses Plaintiffs' requests for injunctive relief without prejudice for lack of standing. The Court dismisses Plaintiffs' front-label protein content claims without prejudice as preempted. The Court dismisses Plaintiffs' common law fraud claims, as well as Zakinov's fraud-based claims based on the presence of non-natural, artificial, or synthetic materials in the Products, without prejudice for failure to comply with Rule 9(b).

Dated: February 21, 2024

_____
SARA L. ELLIS
United States District Judge